JOHN C. BOYDEN, ESQ. (SBN 3917)
ERICKSON, THORPE & SWAINSTON, LTD.
P.O. Box 3559
Reno, NV 89505
(775) 786-3930
jboyden@etsreno.com

Paul A. Turcke (applicant *pro hac vice*)
MSBT LAW, CHARTERED
7699 West Riverside Drive
Boise, ID 83714
(208) 331-1800
pat@msbtlaw.com
Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEVADA**

SIERRA TRAIL DOGS MOTORCYCLE AND RECREATION CLUB; PINE NUT MOUNTAINS TRAILS ASSOCIATION; AMERICAN MOTORCYCLIST ASSOCIATION, DISTRICT 36; CALIFORNIA FOUR WHEEL DRIVE ASSOCIATION and THE BLUE RIBBON COALITION,

Plaintiffs,

vs.

UNITED STATES FOREST SERVICE; HUMBOLDT TOIYABE NATIONAL FOREST; WILLIAM ("BILL") DUNKELBERGER, Forest Supervisor, Humboldt-Toiyabe National Forest;

Defendants.
_______________________________________/

CASE NO:

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## NATURE OF ACTION

1. This action seeks declaratory and injunctive relief requiring Defendants United States Forest Service, Humboldt-Toiyabe National Forest, William ("Bill") Dunkelberger (the "Forest Service") to comply with controlling law while managing the Humboldt-Toiyabe National Forest (the "Forest").

///

2. Plaintiffs specifically challenge the Forest's Greater Sage-grouse Bi-State Distinct Population Segment Forest Plan Amendment Final Record of Decision ("Final ROD") dated May 16, 2016, and accompanying Final Environmental Impact Statement ("FEIS"), special recreation permits issued to Plaintiffs, including but not limited to the permit and annual operating plans for the Mystery 250 event, and related findings or conclusions in documents associated with any of the foregoing agency actions (collectively the "Decisions").

3. The Decisions impose significant restrictions on long-existing recreational access, preventing the agencies from considering permits for off-highway vehicle ("OHV") events in or near habitat for the Bi-State sage-grouse.

4. This action arises under the National Forest Management Act, 16 U.S.C. § 1600 et seq. ("NFMA"); the National Environmental Policy Act, 42 U.S.C. § 4331, et seq. ("NEPA"); the Administrative Procedure Act, 5 U.S.C. § 551, et seq. (the "APA"), and any implementing regulations for these statutes.

**JURISDICTION AND VENUE**

5. Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action arises under the laws of the United States. The conduct complained of creates an actual, justiciable controversy and is made reviewable under the APA.

6. Venue is proper in this Court under 28 U.S.C. § 1391(e) because a plaintiff(s) and defendant(s) resides and/or a substantial number of the events or omissions giving rise to these claims occurred, or, a substantial part of the property that is the subject of these claims is situated, within the District of Nevada. The project at issue involves lands within Alpine and Mono Counties, California, and Douglas, Esmeralda, Lyon and Mineral Counties, Nevada. Esmeralda County is within this Court's Southern Division, while the other above-named Nevada Counties are all within the Court's Northern Division. The Final ROD was issued from the Forest Supervisor's office in Sparks, Nevada.

**PARTIES**

7. Plaintiff Sierra Trail Dogs Motorcycle and Recreation Club ("Trail Dogs") is a nonprofit, California mutual benefit corporation with approximately 135 members. Trail Dogs is

Erickson, Thorpe & Swainston, Ltd.
P. O. Box 3559
Reno, NV 89505
(775) 786-3930

an organizational member of the BlueRibbon Coalition. Trail Dogs are committed to preserving, promoting and supporting each discipline of motorcycling through camaraderie, fellowship and loyalty. Trail Dogs members use motorized and non-motorized means to access and enjoy lands managed by the Forest Service, including lands within the project area at issue in this action. Many find the travel itself rewarding, but it also facilitates various outdoor activities, such as picnicking, camping, sightseeing, wildlife and nature study, hunting and fishing, and similar activities. In addition, many members enjoy participating in specially-permitted events such as trail rides, enduros or similar events that often include routes on public lands, including Forest Service lands. In the project area at issue herein, such events specifically include the Mystery 250, which has occurred since at least 1997. Trail Dogs members have concrete plans to continue conducting this event and to continue visiting the Forest Service lands at issue in this action.

8. Plaintiff Pine Nuts Mountain Trails Association ("Pine Nuts") is a Nevada nonprofit corporation. Pine Nuts is an organizational member of the BlueRibbon Coalition. The organization was formed in 1998 to become involved in development and redirection of management policy for the Pine Nut Mountain Range, located within the project area at issue in this action. Pine Nuts emphasizes work parties and other opportunities to partner alongside government land managers and a diverse community of local users to accomplish meaningful progress on the ground. Pine Nuts has been responsible for removing over 2,000 cubic yards of trash and more than 20 junked cars from the Pine Nuts Range. Pine Nuts members have participated in planning processes addressing recreation on public lands, including those at issue herein, have particularized interests in special events/permitting in the region, and have concrete plans to enjoy motorized recreational access and participation in permitted events within the project area at issue in this action.

9. Plaintiff District 36, American Motorcyclist Association ("District 36") is a regional district of the American Motorcyclist Association ("AMA"), located in northern California. District 36 is organized as a California nonprofit corporation, operating under the name District 36 Motorcycle Sports Committee Corporation, and is an organizational member of the BlueRibbon Coalition. District 36 focuses on providing information, advocacy and event organization regarding motorcycling and motorized use. District 36 members regularly utilize motorized vehicles, and

Erickson, Thorpe & Swainston, Ltd.
P. O. Box 3559
Reno, NV 89505
(775) 786-3930

particularly motorcycles, to access and enjoy lands managed by the Forest Service and BLM, including such lands throughout California, Nevada, and within the project area at issue in this action. The AMA, including District 36, acts as a primary sanctioning body for both competitive and non-competitive motorcycle events, including hare scrambles, enduros and group rides in desert areas within or near sage-grouse habitat, within and beyond the project area at issue in this action. District 36 is presently conducting, and its members participating in, such events and the District and its members have concrete plans to continue such activities in the future.

10. Plaintiff California 4 Wheel Drive Association ("Cal4") is a California nonprofit corporation representing over 8,000 members and 160 clubs in the State of California. Cal4 is an organizational member of the BlueRibbon Coalition. Cal4 members use motorized means to access and enjoy lands managed by the Forest Service, including such lands throughout California, Nevada, and within the project area at issue in this action. In particular, Cal4 members share a common interest in owning, maintaining, and operating stock or modified 4-wheel drive vehicles such as Jeeps and Broncos on dirt roads and trails. Cal4 members also include clubs and individuals whose primary mode of access is by "all terrain vehicle" or ATV. Cal4 members share an interest in their vehicles as they meet mechanical and navigational challenges. This vehicular access also facilitates various outdoor activities, such as picnicking, camping, sightseeing, wildlife and nature study, hunting and fishing, and similar activities. Many Cal4 members, due to age, physical condition, or other factors, would be unable to enjoy meaningful participation in their chosen activities without vehicular access to lands managed by the Forest Service.

11. Plaintiff BlueRibbon Coalition, Inc. ("BlueRibbon") is an Idaho nonprofit corporation that champions responsible recreation and encourages individual environmental stewardship. BlueRibbon has members in all 50 states, including Nevada and California. BlueRibbon members use motorized and non-motorized means, including jeeps, all-terrain vehicles, motorcycles, mountain bikes, horses, and hiking, to access public lands throughout the United States managed by the Forest Service, including such lands in Nevada and California within the project area at issue in this action. BlueRibbon has a long-standing interest in the protection of the values and natural resources addressed herein, and regularly works with land managers to provide recreation opportunities,

Erickson, Thorpe & Swainston, Ltd.
P. O. Box 3559
Reno, NV 89505
(775) 786-3930

preserve resources, and promote cooperation between public land visitors. BlueRibbon members have participated in specially-permitted events and visited the lands at issue in this action via the above-described means of access and intend to do so in the future. BlueRibbon, including through its members, attended public meetings, submitted input to the agencies, provided formal written comments, and otherwise participated in the process that generated the Decisions.

12. Defendant United States Forest Service is a federal agency within the United States Department of Agriculture. The Forest Service is charged with administering and overseeing United States National Forest System lands in accordance with applicable law.

13. Defendant Humboldt-Toiyabe National Forest is a subunit of the United States Forest Service comprised of approximately 1.6 million acres of land located in western Nevada and northeastern California. The Forest's main office is located in Sparks, Nevada.

14. Defendant William ("Bill") Dunkelberger is the Forest Supervisor for the Humboldt-Toiyabe National Forest. He is the supervisor for the Forest and is the ultimate authority for the procedures, actions and decisions of the Forest and is ultimately charged with ensuring the Forest complies with applicable law. Mr. Dunkelberger signed the Final Record of Decision and is responsible for interpreting and implementing the Decisions prescriptions on the Forest. He is sued solely in his official capacity.

**LEGAL FRAMEWORK**

15. The APA addresses and regulates the function of executive branch administrative agencies within our system of open government. Among such functions, the APA represents a waiver of sovereign immunity by the United States and outlines the circumstances in which "final agency action" may be subject to judicial review, as well as the standards of review to be applied in such challenges. Since many statutes and regulations do not provide for a private right of action, the APA provides the jurisdictional basis for judicial review of administrative decisions by federal land management agencies applying statutes like NFMA and NEPA to public lands like the Humboldt-Toiyabe Forest.

16. NFMA provides the statutory framework for management of the National Forest System. NFMA requires each Forest to prepare and revise a Land and Resource Management Plan

Erickson, Thorpe & Swainston, Ltd.
P. O. Box 3559
Reno, NV 89505
(775) 786-3930

("Forest Plan"). 16 U.S.C. § 1604§§. A Forest Plan lays out broad guidelines to advance numerous goals and objectives, including to "insure consideration of the economic and environmental aspects of various systems of renewable resource management, including the related systems of silviculture and protection of forest resource, to provide for outdoor recreation (including wilderness), range, timber, watershed, wildlife, and fish…." *Id.* at (g)(3)(A). These plans contain desired conditions, objectives and guidance for project and activity decision making, but do not approve or execute projects and activities. The guidance in the Forest Plan is subject to change through plan amendment in site-specific or project-level planning, or through revision of the Forest Plan itself.

17. A Forest Plan is the governing land use plan for an individual National Forest. A Forest Plan is strategic in nature, and does not make commitments to selection or specifications of any particular project or daily activities. The Forest Plan also identifies standards and guidelines to govern specific activities subject to more detailed project-level or site-specific planning. However, these project level decisions must be consistent with the Forest Plan.

18. NEPA represents "our basic national charter for protection of the environment." 40 C.F.R. § 1500.1. NEPA's protections of the "environment" refer to the "human environment" which "shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment." 40 C.F.R. § 1508.14. Thus, the agency's duty to analyze impacts does not end with impacts to the physical environment, because "[w]hen an [EIS] is prepared and economic or social and natural or physical environmental effects are interrelated, then the [EIS] will discuss all of these effects on the human environment." *Id.* Among its numerous purposes, NEPA procedures are designed to foster informed, transparent agency decision making built upon informed public participation.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

### A. <u>Bi-State Sage-Grouse and the Project Area</u>.

19. The Greater sage-grouse (*Centrocercus urophasianus*) is an iconic bird that lives in sagebrush-steppe habitats in the Great Basin and high desert areas stretching from Oregon eastward to the Dakotas, and Alberta southward to Nevada. Sage-grouse are still hunted in many of these states, but their populations have generally declined throughout their range.

Erickson, Thorpe & Swainston, Ltd.
P. O. Box 3559
Reno, NV 89505
(775) 786-3930

20. Sage-grouse biology, populations and habitat trends have been extensively studied by federal agencies, tribes, state wildlife managers, local governments and engaged private interests. See, generally, 80 Fed.Reg. 59859-59860 (Oct. 2, 2015). In these efforts, various activities were evaluated and prioritized based on their relative threats to sage-grouse. See, e.g., 75 Fed.Reg. 13924 (Mar. 23, 2010) (listing threats as "direct conversion, urbanization, infrastructure such as roads and power lines built in support of several activities, wildfire and the change in wildfire frequency, incursion of invasive plants, grazing, and nonrenewable and renewable energy development"). The Fish and Wildlife Service included "recreational activities" in a residual category of "other natural or manmade factors" and concluded none of these facts "either separately or in combination, pose a risk to the species." 75 Fed.Reg. 13987 (Mar. 23, 2010).

21. In addition to and during these broader analyses, planning has considered the status and management for the Bi-State sage grouse. This sub-species is located in a relatively narrow area that straddles the boundary between northeastern California and western Nevada, generally known as the Mono Basin. In 2002 the Fish and Wildlife Service first received a petition requesting the Bi-State sage-grouse be "emergency listed" as a "distinct population segment" under the Endangered Species Act. Various actions by the Service, subsequent petitions, lawsuits and settlements followed, as reflected in a "12 month finding" by the Service in March 23, 2010. 75 Fed.Reg. 13909 (Mar. 23, 2010). The Service at that time found the Bi-State sage-grouse met regulatory criteria as a distinct population segment, the listing of which was "warranted but precluded" by "higher priority listing actions." *Id.* at 13910. A proposed rule was published to list the Bi-State sage-grouse as "threatened" (78 Fed.Reg. 64358 (Oct. 28, 2013)) along with a proposed rule to designate "critical habitat" (78 Fed.Reg. 64328 (Oct. 28, 2013)).

22. Following additional analysis and input on various sage-grouse populations, the Service later concluded "that the threats…no longer are as significant as believed" to the Bi-State grouse. 80 Fed.Reg. 22828 (Apr. 23, 2015). The Service concluded, "[t]herefore, we are withdrawing our proposal to list the bi-State DPS of greater sage-grouse as threatened with critical habitat." *Id.*

///

Erickson, Thorpe & Swainston, Ltd.
P. O. Box 3559
Reno, NV 89505
(775) 786-3930

23. The Service's above-referenced conclusion that listing of the Bi-State grouse DPS was "not warranted" was challenged in *Desert Survivors v. U.S. Dept. of Interior*, Case No. 16-cv-1165-JCS (N.D. Cal.). On May 15, 2018 the Court in that matter issued an order granting Plaintiffs' Motion for Summary Judgment declaring that at least certain aspects of the Bi-State grouse "not warranted" listing determination were arbitrary and capricious and thus in violation of law. On August 24, 2018, the Court issued a remedy order which vacated the Service's "withdrawal decision" at 80 Fed.Reg. 22828 (Apr. 23, 2015), reinstated the proposal to list the Bi-State grouse as "threatened" at 78 Fed.Reg. 64328, ordered the Service to provide a new opportunity for public comment and issue a "new and final listing determination" by October 1, 2019, and vacated and set aside the Service's "significant portion of range" policy affecting the above-cited decisions.

24. The Service's conclusion on listing was based, in large part, on a determination that existing regulatory mechanisms as defined by "ongoing and future conservation efforts" would be adequate to conserve the species and militate against listing. *Id.* at 22845.

25. Concurrent with these various reviews and publications, Defendants engaged in planning efforts to clarify and strengthen the "ongoing and future conservation efforts" for Bi-State sage-grouse, which led to the Decisions. The project area for the Decisions involves roughly 967,878 acres managed by the Forest, and 1.7 million acres managed by BLM. The Forest Service acted as the "lead agency" and primarily conducted the NEPA process for the Decisions.

26. The remand of the Bi-State grouse listing decision to the Service does not have a direct legal effect on the Decisions challenged in this action. If anything, the need to revisit the Bi-State grouse listing status will cause Defendants to even more vigorously support the Decisions.

**B. <u>The Humboldt-Toiyabe Plan Amendment Process</u>.**

27. On November 30, 2012, a "notice of intent" was published to declare the Forest's intent to prepare an environmental impact statement ("EIS") and elicit public comment on a project to amend the Forest Plan to address Bi-State grouse management issues. The Forest conducted public meetings and received voluminous comment.

28. On August 23, 2013, the Forest released a draft EIS ("DEIS"), which started a 90 day public comment period. The DEIS presented three alternatives to be analyzed in detail. Alternative

Erickson, Thorpe & Swainston, Ltd.
P. O. Box 3559
Reno, NV 89505
(775) 786-3930

A was the legally-required "no action" alternative. Alternative B was described as the "proposed action." Alternative C was described as the "conservation alternative."

29. A wide array of changes to existing standards/guidelines were proposed in the DEIS, to address the various identified threats to sage-grouse, including hard rock and fluid mineral location/leasing/extraction, rights of way for highways and electrical transmission structures, livestock grazing, wild horses/burros, and wildlife management. These are not at issue in this action.

30. Plaintiffs' interest and this action are focused on what were called the "access/recreation" prescriptions in the various alternatives. For example, one set of prescriptions addressed whether motorized vehicles could travel cross-country. Under Alternative A, cross-country motorized travel was allowed "in a portion of the planning area." Alternative B Standard B-AR-S-02 required that motorized travel be limited to "existing roads, primitive roads, and trails" until routes would be specifically designated for such travel. Alternative C was identified as adopting the same Standard B-AR-S-02. Plaintiffs supported this approach in their initial comments and continue to support it today.

31. There were greater disparities in other "access" prescriptions. For specially permitted OHV events, Alternative A was described as allowing events "using existing direction designed to reduce impacts to resources" determined on "a case-by-case basis after environmental analysis." Alternative B included Standard B-AR-S-03, which provided "[b]etween March 1 and May 15, [OHV] events that pass within 3 miles of an active lek shall only take place during daylight hours after 10 a.m." Alternative C included Standard C-AR-S-03, which provided "[d]o not authorize [OHV] events."

32. For various reasons, including the high level of interest/controversy over sage-grouse management in general, the DEIS comment period was extended several times.

33. On July 11, 2014, a revised DEIS was released. In relevant part, the revised DEIS contained the same language for Alternatives A, B and C on OHV permitted events.

34. On February 5, 2015, the Forest released the final EIS ("FEIS") and Draft Record of Decision ("Draft ROD"). Specific components of the plan amendment are described in Table ROD-1. The rationale(s) for the various choices are stated in a numbered list, located at page 4 of the Draft

Erickson, Thorpe & Swainston, Ltd.
P. O. Box 3559
Reno, NV 89505
(775) 786-3930

ROD.

35. For OHV events, the Draft ROD adopts standard B-AR-S-03, which provides "[b]etween March 1 and May 15, off-highway vehicle events that pass within 3 miles of an active lek shall only take place during daylight hours after 10 a.m." Draft ROD at 5. The listed rationale is "rationale 1" which states "I have decided to includes standards that prohibit projects or activities that, by their nature, would not be able to avoid adverse effects to habitat, because conserving habitat is a purpose of the amendment." Draft ROD at 4.

36. On February 6, 2015, the Forest published legal notice in the Reno Gazette-Journal announcing release of the FEIS and Draft ROD and initiating the 60 day period for objections to the Draft ROD.

37. A total of seven (7) objections were submitted that met applicable criteria and were processed by the reviewing officer. The objection review process was generally conducted under applicable regulations at 36 C.F.R. §§ 219.50-219.62.

38. Plaintiffs did not submit objections. The Draft ROD did not perfectly reflect Plaintiffs' opinions or input, but Plaintiffs were willing to accept the choices outlined in the Draft ROD. In the absence of objections, the Draft ROD would become the final decision and Plaintiffs therefore did not submit objections.

39. Upon learning that other objections had been submitted, Plaintiff BlueRibbon sought under applicable regulation and was provided "interested person" status. See, 36 C.F.R. § 219.57(a).

40. Various efforts occurred to seek "resolution" of the objections. See, 36 C.F.R. § 219.57. These included meetings on May 8, May 19, May 20, and July 30, 2015. The objectors and interested persons participated in these meetings, either attending in person or via telephone.

41. On information and belief, other contacts outside of the aforementioned "meetings" occurred between individual objectors, their counsel/representatives, and Forest Service personnel to discuss resolution.

42. At some point prior to the July 30, 2015 meeting, the objectors and Forest Service circulated written "proposed remedies" to the various objection points. These were discussed and provided the focus of the July 30 meeting.

Erickson, Thorpe & Swainston, Ltd.
P. O. Box 3559
Reno, NV 89505
(775) 786-3930

43. As a result of these various discussions and negotiations, the Forest Service proposed to change Standard B-AR-S-03 for OHV events, to read "[b]etween March 1 and June 30, off-highway vehicle events that pass within 4 miles of an active or pending lek shall not be authorized."

44. Representatives for Plaintiff BlueRibbon participated in the July 30, 2015, meeting via telephone and learned of the resolution proposals. Counsel for BlueRibbon sent a letter dated August 5, 2015 to Supervisor Dunkelberger expressing concern and attempting to "object" to the proposed modification to B-AR-S-03.

45. On October 30, 2015, the Forest published legal notice in the Reno Gazette-Journal announcing "notice of availability" of the post-objection FEIS, stating that as a result of the objection process "the H-TNF was formally instructed to make specific changes to the FEIS and Amendment." The notice further explains "[t]he current FEIS incorporates these changes and comprise the final version of the FEIS."

46. On May 16, 2016, Mr. Dunkelberger signed the Final Record of Decision ("Final ROD"). The Final ROD contains the "resolution" version of Standard B-AR-S-03.

47. A Federal Register notice of the plan amendment approval was published on May 20, 2016, referring to signing of the final ROD and stating the effective date for the plan amendment is 30 days after publication of the notice. 81 Fed.Reg. 31909 (May 20, 2016).

**C. Implementation of the Plan Amendment and Changes to the Mystery 250.**

48. Plaintiffs, and particularly Trail Dogs, have conducted and/or participated in the Mystery 250 since the mid-1990's. The Mystery 250 is an organized motorcycle trail riding event, which has included routes on various lands including public lands managed by the Forest Service. The event falls within applicable regulations and has always received permits from the Forest Service and other governing agencies.

49. Permitted events like the Mystery 250 undergo meaningful and increasing scrutiny, which can include specialist review for any conceivable resource impacts, insurance, liability waivers, and similar requirements. Any possible impacts associated with a permitted event are analyzed and scrutinized to a much greater degree than "casual" recreational riding by the general public.

Erickson, Thorpe & Swainston, Ltd.
P. O. Box 3559
Reno, NV 89505
(775) 786-3930

50. Historically, the Mystery 250 was generally conducted in mid-June, as this offered a suitable balance between resource conditions, rider safety/experience, and the schedule of similar events in the locale and rider community. The event has become very popular, and typically hits the cap on total participants set by the Trail Dogs in consultation with the permitting agencies.

51. As a result of the final ROD and plan amendment, the previously-approved permit terms were modified for the Mystery 250. The 2018 event was approved for July 14-15, with additional modifications to the selected routes to address lek buffers and other modifications under the final ROD and plan amendment.

**COUNT ONE: FOREST PLAN AMENDMENT RESTRICTIONS**

**(NFMA AND REGULATIONS)**

52. Plaintiffs hereby incorporate by reference each statement and allegation previously made.

53. NFMA provides guidance on the process to be used in developing, revising and amending Forest Plans, as well as directing that regulations be promulgated further specify applicable process(es). 16 U.S.C. § 1604. The Forest Service procedures must "give the Federal, State, and local governments and the public adequate notice and an opportunity to comment upon the formulation of standards, criteria, and guidelines applicable to Forest Service programs." 16 U.S.C. § 1612.

54. The Forest Service has promulgated various regulations over time addressing these duties, which have been subjected to varying degrees of public and judicial review. See, e.g., *Sequoia Forestkeeper v. Tidwell*, 847 F.2d 1217 (E.D. Cal. 2012).

55. The current version of the Forest Service regulations adopt a "predecisional administrative review" procedure, which for Forest Plans is codified at 36 C.F.R. §§ 219.50-219.62. This process was applied during the plan amendment at issue herein, particularly including an extensive "resolution process" which ultimately dictated certain aspects of the final ROD.

56. Through the "resolution process" the Forest made unpredictable and significant changes to the Draft ROD, which were formalized in the Final ROD. These changes included extending lek buffers to a distance of 4 miles for the entire day of operations within a seasonal

Erickson, Thorpe & Swainston, Ltd.
P. O. Box 3559
Reno, NV 89505
(775) 786-3930

window extending to June 30.

57. These changes were not specified in any alternative in any of the multiple EISs available for public comment, nor were these changes reasonably foreseeable variations of the alternatives presented or otherwise subject to public review and input.

58. These changes have had and will continue to have adverse impacts to Plaintiffs, limiting the options for selecting routes for the Mystery 250 and similar events and forcing the event to occur on or after July 1, which greatly increases fire risk and safety concerns due to greater heat and reduced moisture.

59. Defendants' actions described above are made reviewable through the APA and are arbitrary, capricious, or otherwise not in accordance with law; in excess of statutory jurisdiction, authority, or limitations; without observance of procedure required by law; or otherwise in violation of the APA, 5 U.S.C. § 706(2), and should therefore be declared unlawful and set aside by this Court.

60. Plaintiffs have suffered, and will continue to suffer, harm and injury to their legal interests arising from and associated with their use and enjoyment of the project area as a result of the allegations contained in this claim for relief, and these injuries will go unredressed absent judicial relief.

**COUNT TWO: PLAN AMENDMENT PERMIT RESTRICTIONS**

**(NEPA AND REGULATIONS)**

61. Plaintiffs hereby incorporate by reference each statement and allegation previously made.

62. NEPA imposes a mandatory procedural duty on federal agencies to consider a reasonable range of alternatives in an EIS. 40 C.F.R. § 1502.14. The alternatives section is considered the "heart" of an EIS. *Id.* A NEPA analysis is invalidated by the existence of a viable but unexamined alternative.

63. The agencies evaluated only three alternatives in the Plan Amendment EIS. For the special event permit prescriptions at issue in this action: (a) Alternative A ("no action") would allow events "using existing direction designed to reduce impacts to resources" determined on "a case-by-case basis after environmental analysis."; (b) Alternative B ("proposed action") Standard B-AR-S-03

Erickson, Thorpe & Swainston, Ltd.
P. O. Box 3559
Reno, NV 89505
(775) 786-3930

provided "[b]etween March 1 and May 15, [OHV] events that pass within 3 miles of an active lek shall only take place during daylight hours after 10 a.m."; (c) Alternative C ("conservation alternative") Standard C-AR-S-03, which provided "[d]o not authorize [OHV] events."

64. The Draft ROD proposed to adopt Alternative B.

65. Through the objection review process, the Forest Service elicited and eventually obtained an agreement with the objectors on the special event permit prescriptions. That agreement became a modified Standard B-AR-S-03 for OHV events, to read "[b]etween March 1 and June 30, off-highway vehicle events that pass within 4 miles of an active or pending lek shall not be authorized."

66. The Final ROD adopts in full the above-cited modified version of Standard B-AR-S-03.

67. These changes to Standard B-AR-S-03 are significant because they nearly double the size of lek buffers, they extend the need to impose lek buffers beyond the crepuscular hours to the entire day, and prohibit permitted events from including any routes within 4 miles of "an active or pending lek" prior to June 30. It is nearly impossible to design a viable route system in the project area for the Mystery 250 that does not include a route(s) passing within 4 miles of such a lek(s).

68. The unique terms of the agreement/Final ROD governing special event permits were not disclosed during the NEPA process and were not a reasonably foreseeable combination or refinement of the alternatives presented in any EIS. These unique terms therefore were not subject to public review/comment, prior to being selected in the Final ROD.

69. Defendants' actions described above are made reviewable through the APA and are arbitrary, capricious, or otherwise not in accordance with law; in excess of statutory jurisdiction, authority, or limitations; without observance of procedure required by law; or otherwise in violation of the APA, 5 U.S.C. § 706(2), and should therefore be declared unlawful and set aside by this Court.

70. Plaintiffs have suffered, and will continue to suffer, harm and injury to their legal interests arising from and associated with their use and enjoyment of the project area as a result of the allegations contained in this claim for relief, and these injuries will go unredressed absent judicial relief.

Erickson, Thorpe & Swainston, Ltd.
P. O. Box 3559
Reno, NV 89505
(775) 786-3930

**COUNT THREE: SPECIAL EVENT PERMITS**

**(NFMA, NEPA AND REGULATIONS)**

71. Plaintiffs hereby incorporate by reference each statement and allegation previously made.

72. Under applicable regulations, Defendants administer various special uses including issuance of permits for OHV events. One such event within the project area for the Decision is the Mystery 250, a motorcycle enduro which has been conducted by Trail Dogs since at least 1997.

73. Trail Dogs have historically received permits for the Mystery 250, approving a mid-June date for the event.

74. As a result of the expiration of the prior permits and/or adoption of the Decisions, Trail Dogs was required to obtain a new permit. Trail Dogs inquired of agency personnel, and were instructed to submit the permit to comply with the new prescriptions of the Decisions, including the new Standard B-AR-S-03 stating "[b]etween March 1 and June 30, off-highway vehicle events that pass within 4 miles of an active or pending lek shall not be authorized."

75. The new standards require significant change to the manner in which the event has been conducted. The event must now be conducted in mid-July, rather than the historical date in mid-June. The event must also occur on routes that do not traverse the 4 mile "lek buffers" which were not previously considered by Defendants, at least not as now defined.

76. These changes create significant hardships and adverse impacts of both practical and legal consequence, in large part because of the significantly drier and hotter conditions in July compared to June, resulting in health and safety risks, increased fire danger, and other potential resource impacts or complications.

77. Defendants' actions described above are made reviewable through the APA and are arbitrary, capricious, or otherwise not in accordance with law; in excess of statutory jurisdiction, authority, or limitations; without observance of procedure required by law; or otherwise in violation of the APA, 5 U.S.C. § 706(2), and should therefore be declared unlawful and set aside by this Court.

78. Plaintiffs have suffered, and will continue to suffer, harm and injury to their legal interests arising from and associated with their use and enjoyment of the project area as a result of

Erickson, Thorpe & Swainston, Ltd.
P. O. Box 3559
Reno, NV 89505
(775) 786-3930

the allegations contained in this claim for relief, and these injuries will go unredressed absent judicial relief.

**COUNT FOUR: VIOLATION OF THE APA**

79. Plaintiffs hereby incorporate by reference each statement and allegation previously made.

80. Defendants' failure(s) described above to comply with NFMA, NEPA, implementing regulations and the APA are arbitrary, capricious, or otherwise not in accordance with law; contrary to constitutional right, power, privilege or immunity; in excess of statutory jurisdiction, authority, or limitations; without observance of procedure required by law; short of statutory right; or otherwise in violation of the APA, 5 U.S.C. § 706(2), and should therefore be declared unlawful and set aside by this Court.

81. Plaintiffs have suffered, and will continue to suffer, harm and injury to their legal interests arising from and associated with their use and enjoyment of the project area as a result of the allegations contained in this claim for relief, and these injuries will go unredressed absent judicial relief.

**REQUEST FOR RELIEF**

Wherefore, having alleged the above-described violations of law, Plaintiffs respectfully request judgment in their favor on each and every claim alleged herein, and request that the Court rule, adjudge, and grant relief as follows:

1. Declare unlawful and set aside the Final ROD and/or Permit(s);
2. Remand the applicable matters in the Final ROD and/or Permit(s) for further analysis and action in accordance with applicable law;
3. Award the Plaintiffs their reasonable fees, costs, and expenses of litigation as allowed by the Equal Access to Justice Act, 28 U.S.C. § 241 *et seq.* and other applicable law or rule of court; and
4. Grant such further and additional relief as the Court deems just and proper.

///

///

Erickson, Thorpe & Swainston, Ltd.
P. O. Box 3559
Reno, NV 89505
(775) 786-3930

**Affirmation**

The undersigned does hereby affirm that the preceding document does not contain the social security number of any person.

DATED this 18th day of December, 2018.

ERICKSON, THORPE & SWAINSTON, LTD.

BY: ______________________
JOHN C. BOYDEN, ESQ.
Attorneys for Plaintiffs

Erickson, Thorpe & Swainston, Ltd.
P. O. Box 3559
Reno, NV 89505
(775) 786-3930